# EXHIBIT A

SFGate.com

## Myth of the 'Twinkie defense'
### The verdict in the Dan White case wasn't based on his ingestion of junk food

Carol Pogash
Sunday, November 23, 2003

Ask anyone who's heard of Dan White -- and there are fewer and fewer people who have -- how it was that the clean-cut, conservative San Francisco supervisor received such a light sentence in the shooting deaths of progressive San Francisco Mayor George Moscone and gay Supervisor Harvey Milk 25 years ago, and it brings an automatic response: the "Twinkie defense." The impressionable jury, they'll say, swallowed the defense contention that Dan White gobbled Twinkies, which blasted sugar through his arteries and drove him into a murderous frenzy. About as simple as: "Eat a Twinkie, commit a murder."

As Thursday's 25th anniversary of the killings approaches, what survives is a shared understanding of the gross miscarriage of justice: that an angry young man many thought should have received the death penalty instead was convicted of voluntary manslaughter and got a meager sentence of less than eight years (with time off for good behavior, he would end up serving only five years, one month and nine days).

The "Twinkie defense" is so ingrained in our culture that it appears in law dictionaries, in sociology textbooks, in college exams and in more than 2, 800 references on Google. Only a few of them call it what it is: a myth.

"I don't think Twinkies were ever mentioned in testimony," said chief defense attorney Douglas Schmidt, who recalls "HoHos and Ding Dongs," but no Twinkies. In fact, the cream-filled confections were mentioned, but only in passing. Junk food was an insignificant part of the defense. The matter was raised briefly in testimony by Marin psychiatrist Martin Blinder, one of five defense therapists. Today, the entire episode is characterized by Schmidt as "a throwaway witness . . . with a throwaway line."

The main focus of the defense's case in May 1979 was diminished capacity -- that White had suffered from periodic bouts of depression, amounting to "a major mental illness." That, along with "the machinations of dirty politics at City Hall," White's co-counsel Stephen Scherr said in a recent interview, "drove him 'round the bend."

During his day on the stand, Blinder, a former mayor of San Anselmo and a onetime teacher at UCSF's medical school and at Hastings College of the Law, characterized White as his family's black sheep, a man with rigid values and locked-up emotions. In a recent interview, Blinder said his intent was to explore, "What is it that makes a good man kill?"

In his daylong accounting of how White's life "unraveled," one small aspect of something Blinder

said -- "two minutes of a greater part of the day on the stand" -- was later turned into the irrational explanation for everything that came after. "Studies show," he said recently, "that if you have a general predisposition to bipolar mood swings, things you ingest can play a part." In the days leading up to the killings, the psychiatrist told the jury, White cast aside his normal habits and grew slovenly, quit working, shunned his wife, grew a stubble beard and rather than eat his healthful diet, indulged in Twinkies and Coke -- all symptoms, Blinder testified, of depression. The junk food, he said, only made White more depressed, which caused him to binge even more.

Today, a still-angry Blinder says, "It's preposterous to think that 12 middle class homeowner jurors would give a killer even a partial pass on the basis of what he ate the night before." He blames the press for perpetuating the myth. "If I found a cure for cancer," he said, "they'd still say I was the guy who invented 'The Twinkie defense.' "

"It drives me crazy," said co-counsel Scherr, who suspects the simplistic explanation provides cover for those who want to minimize and trivialize what happened. If he ever strangles one of the people who says "Twinkie Defense" to him, Scherr said, it won't be because he's just eaten a Twinkie.

A 1979 San Francisco Examiner story on the anatomy of the White defense, written by Jim Wood, my late husband, cited the makeup of the conservative, mostly female jury, many with children the age of defendant (there were no gays and no African Americans). Wood pointed out that the defense had not challenged the facts, but had put on a psychiatric defense for the former cop and firefighter. White, the defense claimed, had acted in the heat of passion, not out of malice. In his depressive state, he had "snapped." Not once in the lengthy piece did Wood say anything about a sugar rush, and Wood, who went on to become the wine and food editor of the Examiner, cared about food.

In his 24-page closing argument, defense attorney Schmidt acknowledged that White was "guilty."

"The only issue," he told jurors "is the degree of responsibility." His client "was a good man, a man with a fine background," Schmidt declared, but "there was something wrong with that man." Schmidt said psychiatrists had found that White was incapable of "deliberation" -- one of the requirements for a first degree murder conviction. He claimed that White had suffered from "diminished capacity" and in that state had acted in "the heat of passion . . .

which fogs judgment."

In two lukewarm paragraphs, Schmidt let the jury nibble on the snack food explanation: "Whether or not ingestion of food stuffs with preservatives and sugar in high content causes you to alter your personality somehow, or causes you to act in an aggressive manner, I don't know. I'm not going to suggest to you for a minute that that occurs. But there is a minority opinion in psychiatric fields that there is some connection . . ."

"It wasn't a big deal, not in the overall context of depression," recalled former Chronicle reporter Duffy Jennings, who covered the trial for this newspaper.

But over time, the media found it convenient to adopt a snappy nickname. "It's not as sexy to call it a depression case," Jennings said.

During the trial, no one but well-known satirist Paul Krassner -- who may have coined the phrase "Twinkie defense" -- played up that angle. His trial stories appeared in the San Francisco Bay Guardian. Since then, Krassner went on to publish another piece in The Nation and more recently to write a book, "Sex, Drugs & The Twinkie Murders."

In a thoughtful essay about San Francisco's "wild, manic depressive swings," and "its not very well-hidden undercurrents," the day after the verdict, Chronicle columnist Herb Caen remarked about the police support for Dan White and their "dislike (understatement) of homosexuals." In an offhand remark, he added that one attorney was calling it "the Twinkie insanity defense."

Several weeks later, Newsweek spread the term. And by September, barely four months later, outrage had spilled over into the Legislature. There, politicians debated the diminished-capacity defense, eventually abolishing it, in large part because of the White trial. In the course of the debate, conservative Democrat Alister McAlister, anxious to make his point, waved a Twinkie in the air. Within two years, the phrase had slipped into popular lingo. Newspapers across the country, including The Chronicle, were tossing around the "Twinkie defense" as if it were synonymous with diminished capacity.

The true story was far more disturbing.

Back in those tumultuous days, when politics was almost a pugilistic sport, the progressive and puckish Harvey Milk became the first openly gay San Francisco supervisor (and possibly the first openly gay elected official in the nation). Extreme right-wingers felt Milk and other gays threatened their American way of life. Milk told me, as he no doubt told other reporters, he had received so many death threats that he expected to be assassinated. But surely, he didn't expect the bullet to come from a colleague.

To Milk's far right on the board stood a crisp all-American-boy, Supervisor Dan White, whose conservative views reflected his Excelsior neighborhood. About a year after his election to the board, the 32-year-old White suddenly resigned. With a pregnant wife, he no longer could afford to earn only $9,600 annually.

Moscone publicly stated that if White changed his mind, he could have his job back. Five days later, after appeals from firefighters, police and neighborhood residents, White did want it back. But by then, liberal supervisors, led by Milk, had persuaded the mayor to appoint a liberal to the open seat. Believing he had been betrayed, White loaded his .38 revolver on the morning of Nov. 27,

Case 3:07-cv-03431-EMC    Document 47    Filed 02/01/2008    Page 5 of 6

1978, stuffed his pockets with bullets and headed for City Hall. To avoid the metal detectors, he climbed in through a basement window and scurried to the mayor's office. Moscone was shot in the chest and head at close range. White reloaded his gun then fled into the supervisors' chambers, where he killed Milk.

The debate still rages over how White could have been found guilty of only two counts of voluntary manslaughter when it seemed clear he had committed premeditated murder. He'd shown up at City Hall with a loaded revolver determined to meet with the mayor and, after killing him, reloaded before going to kill Milk. As former newspaperman Jennings said, "It seemed like a slam dunk."

But faced with a death penalty case, prospective jurors were asked if they supported capital punishment, a requirement that former DA Joseph Freitas,

Jr., says made them more conservative than the natural pool of San Francisco jurors. That, he said, was the first step toward a "miscarriage of justice" in the case.

These "everyday working people," Jennings said, "didn't care much for liberal politicians." When the jury listened to Dan White's confession, some of them wept.

"A lot of people share this view that the trial was lost in the jury selection," said Moscone's former press secretary and family friend, Corey Busch. But Busch argues there was more to it than that. He's still angered by what he calls the defense's "very cynical approach." Although he was not in the courtroom, Busch contends the defense portrayed White as a victim of the city's cultural and political change. The diminished capacity argument, he believes, was no more than "a hook the jury was able to hang its hat on."

"If White had just murdered the mayor, I think the outcome of the trial would have been very different," he said. But with a conservative jury, which Busch considered homophobic, jurors felt more comfortable finding White guilty of a lesser crime.

Darlene Benton, who was on that jury, takes umbrage at that. "People think it was about Twinkies and gays," she said. "It wasn't. I was born and raised in San Francisco. I've never been against gay people. There may have been a couple of jurors who were," she said, "but they never told us they felt that way."

"There was no question that Dan White was guilty," the now-57-year-old insurance agent said, but "the prosecution thought it was such a clear-cut case they didn't do their job." Yes, she said, White carried a gun into City Hall, but then witnesses testified so did then-Mayor Dianne Feinstein. Sure, White climbed through a window, rather than submit to the metal detectors, but,

Benton said, others climbed through that window as well. White reloaded his gun after shooting the mayor to death, but that, she said, is something police officers and former cops do

automatically. And Twinkies, she said, played no part.

For days, jurors examined the evidence and the defense's contention that White suffered from diminished capacity and depression. On a blackboard, they scribbled pros and cons of premeditation. The discussion grew so heated, and the yelling so loud, that at one point, they were escorted to the roof of the Hall of Justice to cool off. The jury was especially hung up over the killing of Milk because White had reloaded his revolver just beforehand. It was not until the final day of deliberation that jurors, mindful that they had to take into account "reasonable doubt," agreed to the lesser charge.

Busch was at the home of the slain mayor when the verdict came in. "I don't know how to describe the feeling of such a lack of justice," he said. "The family accepted it for what it was. But there was a lot of pain."

The gay community's agony spewed out onto the streets of San Francisco. During what came to be called the White Night riot, protestors set fire to police cars and stormed City Hall. The violence was in marked contrast to the day Moscone and Milk died. Then, a candlelight march flowed quietly and peacefully from the Castro district to City Hall.

Yet, all that many people remember about the case that still engenders such anger and passion is that jurors succumbed to the defense claim that a politician ate Twinkies and then executed the mayor and a fellow supervisor.

"America loves labels," said Dr. Alan Dundes, UC Berkeley professor of anthropology and folklore. He compares our belief in the "Twinkie defense" to the conviction that George Washington cut down the cherry tree. He didn't. Folklore trumps history.

"I don't care if the 'Twinkie defense' has any validity or not," he said. "People think it was a factor. And thinking makes it so."

*Carol Pogash is a Bay Area writer. She and her late husband Jim Wood both wrote for the San Francisco Examiner.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2003/11/23/INGRE343501.DTL

This article appeared on page **D - 1** of the San Francisco Chronicle