1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF CALIFORNIA
2
              HONORABLE LARRY ALAN BURNS, JUDGE PRESIDING
3


4
     UNITED STATES OF AMERICA,          )
5                                       )
                     PLAINTIFF,         )   CASE NO. 07CR03101-LAB
6                                       )
              VS.                       )
7                                       )   SAN DIEGO, CALIFORNIA
     JULIO MARTINEZ-HERNANDEZ,          )   JANUARY 24, 2008
8                                       )   10:00 A.M.
                     DEFENDANT.         )
9    _____)


10


11                        REPORTER'S TRANSCRIPT

12                     VIDEO DEPOSITION HEARING

13


14
     APPEARANCES:
15   FOR THE GOVERNMENT:            KAREN P. HEWITT, U.S. ATTORNEY
                                    BY:  A. DALE BLANKENSHIP, ESQ.
16                                       LAUREN J. BAREFOOT, ESQ.
                                    ASSISTANT U.S. ATTORNEYS
17                                  880 FRONT STREET
                                    SAN DIEGO, CA 92101
18
     FOR THE DEFENDANT:             FEDERAL DEFENDERS, INC.
19                                  BY:  STEPHEN DEMIK, ESQ.
                                    225 BROADWAY, STE. 900
20                                  SAN DIEGO, CA 92101

21


22   COURT REPORTER:               EVA OEMICK
                                    OFFICIAL COURT REPORTER
23                                  UNITED STATES COURTHOUSE
                                    940 FRONT STREET, STE. 2190
24                                  SAN DIEGO, CA 92101
                                    TEL: (619) 615-3103
25

1    **SAN DIEGO, CALIFORNIA – THURSDAY, JANUARY 24, 2008–10:00 A.M.**

2            THE CLERK:  CALLING NO. 1 ON THE CALENDAR,

3    07CR03101, USA VERSUS JULIO MARTINEZ-HERNANDEZ ON FOR VIDEO

4    DEPOSITION HEARING.

5            MR. BLANKENSHIP:  GOOD MORNING, YOUR HONOR.  DALE

6    BLANKENSHIP AND LAUREN BAREFOOT ON BEHALF OF THE UNITED

7    STATES.

8            THE COURT:  GOOD MORNING, MR. BLANKENSHIP AND

9    MS. BAREFOOT.

10            MR. DEMIK:  GOOD MORNING, YOUR HONOR.  STEPHEN

11    DEMIK, FEDERAL DEFENDERS, ON BEHALF OF MR. MARTINEZ WHO IS NOW

12    PRESENT BEFORE THE COURT IN CUSTODY.

13            THE COURT:  GOOD MORNING, MR. MARTINEZ.

14            THE COURT HAS AUTHORIZED AND ORDERED THE VIDEOTAPED

15    DEPOSITION OF GOVERNMENT WITNESS AGENT LEE MILLER.  AGENT

16    MILLER IS PRESENT.  THE DEPOSITION MAY COMMENCE AT THIS TIME.

17            MR. BLANKENSHIP:  DALE BLANKENSHIP WITH LAUREN

18    BAREFOOT FROM MY OFFICE.  I DO HAVE AGENT MILLER, AND RAY

19    CHRISTENSEN FROM MY OFFICE WILL BE CONDUCTING THE VIDEOTAPING.

20            AT THIS TIME, THE GOVERNMENT CALLS LEE MILLER TO THE

21    STAND.

22                            **LEE MILLER**

23    WAS CALLED AS A WITNESS AND, AFTER HAVING BEEN DULY SWORN,

24    TESTIFIED AS FOLLOWS:

25            THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

3

1    YOUR LAST NAME FOR THE RECORD.

2            THE WITNESS:  MY NAME IS LEE MILLER, L-E-E

3    M-I-L-L-E-R.

4                    **DIRECT EXAMINATION**

5    **BY MR. BLANKENSHIP:**

6    Q.   GOOD MORNING, AGENT MILLER.

7            CAN YOU PLEASE TELL THE COURT, BY WHOM ARE YOU

8    EMPLOYED?

9    A.   YES, SIR.

10           I'M A UNITED STATES BORDER PATROL AGENT.

11   Q.   YOU RECOGNIZE THE TESTIMONY THAT YOU'RE GIVING HERE --

12   YOU'VE JUST BEEN SWORN IN.  THE TESTIMONY YOU'RE GIVING HERE

13   IS THE SAME AS IF YOU WERE GIVING IT IN TRIAL.

14   A.   YES, SIR, I UNDERSTAND.

15   Q.   AGENT MILLER, CAN YOU PLEASE TELL THE COURT, HOW LONG

16   HAVE YOU BEEN EMPLOYED WITH THE UNITED STATES BORDER PATROL?

17   A.   YES, SIR.

18           I'VE BEEN EMPLOYED NINE AND A HALF YEARS WITH THE

19   BORDER PATROL.

20   Q.   AND WHERE HAVE YOU BEEN STATIONED FOR THOSE NINE YEARS?

21   A.   YES, SIR.

22           BARRING THE ACADEMY TIME, WHICH WAS ABOUT SIX

23   MONTHS, I'VE BEEN STATIONED AT THE IMPERIAL BEACH AREA FOR THE

24   ENTIRE NINE YEARS.

25   Q.   AND IS THAT ALSO WHERE YOU'RE CURRENTLY ASSIGNED?

4

1   A.   YES, SIR.

2   Q.   NOW, CAN YOU PLEASE GENERALLY DESCRIBE YOUR DUTIES WITH

3   THE BORDER PATROL.

4   A.   YES, SIR.

5          I'M ASSIGNED TO THE ALL-TERRAIN VEHICLE UNIT THERE

6   IN THE IMPERIAL BEACH AREA OF OPERATIONS AND PATROL THAT AREA,

7   APPROXIMATELY 13 MILES OF THE BORDER, ON AN ALL-TERRAIN

8   VEHICLE, AN ATV.

9   Q.   WERE YOU ON DUTY ON OCTOBER 15TH, 2007?

10  A.   YES, SIR, I WAS.

11  Q.   AND CAN YOU TELL THE COURT WHERE YOU WERE ASSIGNED ON

12  OCTOBER 15TH, 2007.

13  A.   YES, SIR.

14         I WAS SPECIFICALLY ASSIGNED TO THE WEST ZONE AREA OF

15  OPERATIONS OF THE IMPERIAL BEACH AREA, WHICH IS THE AREA

16  CONSISTING OF THE BORDER TO THE WEST OF THE SAN YSIDRO PORT OF

17  ENTRY ALL THE WAY TO THE BEACH.

18  Q.   WHEN YOU SAY THE "BEACH," ARE YOU TALKING ABOUT THE BEACH

19  THAT IS PART OF THE PACIFIC OCEAN, SAN DIEGO --

20  A.   YES, SIR, IMPERIAL BEACH, FRIENDSHIP PARK.

21  Q.   NOW, I'D LIKE TO DIRECT YOUR ATTENTION TO THE MORNING

22  HOURS OF OCTOBER 15TH, 2007 AT APPROXIMATELY 5:20 A.M.

23         DID YOU HAVE OCCASION TO BECOME INVOLVED IN THE

24  ARREST OF THE DEFENDANT IN THIS CASE, JULIO

25  MARTINEZ-HERNANDEZ?

5

1    A.    YES, SIR, I DID.

2    Q.    CAN YOU -- BEFORE WE GET INTO THE SPECIFICS OF THAT

3    EVENT, CAN YOU PLEASE DESCRIBE THE LOCATION OF AN AREA CALLED

4    THE ELBOW.

5    A.    YES, SIR.

6         THE ELBOW IS LOCATED APPROXIMATELY A HALF A MILE TO

7    THE WEST OF THE SAN YSIDRO PORT OF ENTRY.  AND IT'S DIRECTLY

8    ADJACENT TO THE U.S./MEXICO BORDER PROBABLY 250 YARDS,

9    300 YARDS TO THE NORTH OF THE ACTUAL INTERNATIONAL BOUNDARY.

10        MR. BLANKENSHIP:  YOUR HONOR, MAY I APPROACH THE

11   WITNESS?

12        THE COURT:  YOU MAY.

13        MR. BLANKENSHIP:  I'VE HANDED TO THE WITNESS WHAT'S

14   BEEN MARKED AS GOVERNMENT'S EXHIBITS 1A AND 1B -- I'M SORRY --

15   1A AND 2A.

16   BY MR. BLANKENSHIP:

17   Q.    CAN YOU FIRST TAKE A LOOK AT GOVERNMENT'S EXHIBIT 1A.

18   A.    YES, SIR.

19   Q.    DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT 1A?

20   A.    YES, SIR, I DO.

21   Q.    WHAT IS THAT?

22   A.    THIS IS THE EASTERNMOST PORTION OF THE WESTERN ZONE OF

23   THE IMPERIAL BEACH AREA OF OPERATIONS.

24   Q.    IS THAT ALSO A GOOGLE MAP REPRESENTATION OF THAT AREA?

25   A.    YES, SIR, THAT APPEARS TO BE WHAT IT IS.

6

1   Q.   HOW ARE YOU ABLE TO RECOGNIZE GOVERNMENT'S EXHIBIT 1A?

2   A.   JUST FROM MY EXPERIENCE WORKING THERE FOR THE LAST

3   NINE YEARS, I RECOGNIZE THE AREA.

4   Q.   AND IS GOVERNMENT'S EXHIBIT 1A A FAIR AND ACCURATE

5   DEPICTION OF THE U.S./MEXICO INTERNATIONAL BORDER AREA AND THE

6   IMPERIAL BEACH BORDER PATROL STATION AREA OF RESPONSIBILITY,

7   AND SPECIFICALLY THE ELBOW AREA?

8   A.   YES, SIR, IT IS.

9        MR. BLANKENSHIP:  AT THIS TIME, I'D MOVE TO ADMIT

10   GOVERNMENT'S EXHIBIT 1A, YOUR HONOR.

11        MR. DEMIK:  NO OBJECTION.

12        THE COURT:  1A IS ADMITTED.

13        (**EXHIBIT NO. 1A RECEIVED INTO EVIDENCE**)

14   BY MR. BLANKENSHIP:

15   Q.   YOU INDICATED THAT THIS IS THE AREA THAT YOU'VE BEEN

16   WORKING, AND SPECIFICALLY OCTOBER THE 15TH YOU WERE IN THIS

17   AREA?

18   A.   YES, SIR.

19   Q.   WHERE IN PARTICULAR IS THE ELBOW LOCATED ON GOVERNMENT'S

20   EXHIBIT 1A?

21   A.   THE ELBOW IS RIGHT HERE (INDICATING).  IT LOOKS LIKE AN

22   L-SHAPE.  IT'S ACTUALLY THE NORTH LEVEE OF THE TIJUANA RIVER

23   WHERE IT TURNS FROM RUNNING EAST/WEST TO NORTH/SOUTH.  SO

24   RIGHT HERE IN THIS PICTURE (INDICATING).

25   Q.   AND CAN YOU PLEASE INDICATE ON GOVERNMENT'S EXHIBIT 1A

7

1    THE APPROXIMATE LOCATION OF THE U.S./MEXICO INTERNATIONAL

2    BORDER.

3    A.   YES, SIR.

4         IT'S RIGHT HERE (INDICATING).  IF YOU CAN SEE THIS

5    YELLOW LINE, IT'S JUST BARELY NORTH OF THAT YELLOW LINE RIGHT

6    THERE RUNNING EAST/WEST.

7    Q.   DOES THAT LINE EXTEND ALL THE WAY FROM THE LEFTMOST

8    PORTION OF GOVERNMENT'S EXHIBIT 1A TO THE RIGHTMOST PORTION OF

9    GOVERNMENT'S EXHIBIT 1A?

10   A.   YES, SIR, IT DOES.

11   Q.   WITH RESPECT TO THE ELBOW, YOU INDICATED WITH YOUR FINGER

12   ON GOVERNMENT'S EXHIBIT 1A AN AREA THAT IS APPROXIMATELY

13   ONE-THIRD FROM THE BOTTOM OF THE PAGE UP AND IN ALMOST THE

14   DIRECT CENTER OF THAT ONE-THIRD OF THE WAY UP?

15   A.   YES, SIR, RIGHT HERE (INDICATING).

16   Q.   CAN YOU NOW TAKE --

17        MR. BLANKENSHIP:  MAY I APPROACH THE WITNESS, YOUR

18   HONOR?

19        THE COURT:  YES.

20   BY MR. BLANKENSHIP:

21   Q.   CAN YOU TAKE A PEN THERE AND CIRCLE THE AREA OF THE

22   ELBOW.

23   A.   YES, SIR.

24   Q.   AND YOU'VE INDICATED --

25        CAN YOU PUT YOUR INITIALS NEXT TO THE CIRCLE THERE.

1          NOW, DIRECTING YOUR ATTENTION TO THE EARLY MORNING

2     HOURS OF OCTOBER 15TH, CAN YOU PLEASE DESCRIBE THE

3     CIRCUMSTANCES THAT LED TO YOUR INVOLVEMENT IN THE ARREST OF

4     THE DEFENDANT.

5     A.   YES, SIR.

6          I WAS RIDING MY ALL-TERRAIN VEHICLE TO THE SOUTH

7     LEVEE ROAD JUST NORTH OF THE BOLLARD WHEN APPROXIMATELY AT THE

8     SAME TIME I OBSERVED SOME INDIVIDUALS AND THE E SCOPE OPERATOR

9     CALLED OUT THAT HE HAD FOUR INDIVIDUALS RUNNING NORTHBOUND

10    TOWARDS THE ELBOW.

11    Q.   YOU SAID THE "BOLLARD."

12         CAN YOU DESCRIBE WHAT THE BOLLARD IS FOR THE COURT.

13    A.   YES, SIR.

14         THE BOLLARD IS A CONCRETE FENCE MADE OUT OF CONCRETE

15    POLES WITH A METAL EXTENSION ON TOP OF IT, ANGLED METAL

16    EXTENSION.  IT'S ACTUALLY THE SECOND FENCE THAT YOU WOULD HAVE

17    TO CROSS TO ENTER THE UNITED STATES ILLEGALLY IN THIS AREA.  I

18    WAS DIRECTLY NORTH OF THAT FENCE.  THERE'S A ROAD THAT GOES

19    ALONG THE BOTTOM, A DIRT ROAD, THAT WE LOOK FOR FOOTPRINTS AND

20    OTHER SIGNS OF ENTRY INTO THE COUNTRY.

21    Q.   AND THAT FENCE EXTENDS THE ENTIRE LENGTH EAST AND WEST IN

22    THE AREA OF THE ELBOW?

23    A.   YES, SIR, IT DOES.

24    Q.   AFTER YOU SAW THOSE INDIVIDUALS, YOU SAID YOU SAW THEM

25    WHILE YOU WERE AT THE BOLLARD FENCE?

9

1    A.   YES, SIR.  I WAS SOUTH OF THE ELBOW AND A LITTLE BIT TO

2    THE WEST, IF I CAN DIRECT YOUR ATTENTION TO THE MAP HERE, IN

3    APPROXIMATELY THIS AREA KNOWN AS STEWART'S BRIDGE

4    (INDICATING).  AND I OBSERVED THE MOVEMENT OF INDIVIDUALS

5    RUNNING TO THE NORTH.

6    Q.   AND YOU'VE CIRCLED THE AREA WHERE YOU OBSERVED THAT

7    MOVEMENT?

8    A.   YES, SIR.  --

9    Q.   AND WHAT DID YOU DO WHEN YOU OBSERVED THAT MOVEMENT?

10   A.   THAT'S WHEN I -- ON MY ATV, I TRAVERSED ACROSS THE

11   TIJUANA RIVER, WHICH AT THAT TIME WAS DRY, AND MADE MY AWAY

12   DIRECTLY TOWARDS THE ELBOW.

13   Q.   WHAT HAPPENED WHEN YOU ARRIVED IN THE AREA OF THE

14   ELBOW?

15   A.   YES, SIR.

16        MY RIDING PARTNER AND MY SUPERVISOR AGENT JAY

17   LAMBERT HAD BEEN ALSO IN THE AREA, AND HE HAD ALREADY GOTTEN

18   THERE BEFORE I DID.  HE HAD TWO INDIVIDUALS IN CUSTODY

19   DETAINED.

20   Q.   AND I'D LIKE TO DIRECT YOUR ATTENTION TO GOVERNMENT'S 2A.

21   JUST TAKE A LOOK AT THAT TO YOURSELF REAL QUICK.

22        DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT 2A?

23   A.   YES, SIR.  THIS IS A PICTURE TAKEN FROM ON TOP OF THE

24   ELBOW LOOKING TO THE NORTH/NORTHWEST.

25        MR. BLANKENSHIP:  MAY I RETRIEVE GOVERNMENT'S

1    EXHIBIT 2A?

2              THE COURT:  MR. DEMIK, YOU MAY APPROACH AND LOOK AT

3    THE EXHIBIT HERE.

4              MR. DEMIK:  THANK YOU, YOUR HONOR.

5    BY MR. BLANKENSHIP:

6    Q.   NOW, WITH RESPECT TO GOVERNMENT'S EXHIBIT 2A, CAN YOU

7    PLEASE TELL THE COURT WHAT THAT IS.

8    A.   YES, SIR.

9              THIS IS THE ELBOW -- A PICTURE TAKEN FROM THE ELBOW

10   LOOKING OFF FROM THE NORTH AND WEST.

11   Q.   HOW DO YOU KNOW RECOGNIZE GOVERNMENT'S EXHIBIT 2A?

12   A.   AGAIN, FROM MY EXPERIENCE IN WORKING THERE FOR SO LONG.

13   AND ALSO, THERE'S SEVERAL FEATURES, THE BEND IN THE ROAD AND

14   THE METAL FENCE.

15   Q.   DOES GOVERNMENT'S EXHIBIT 2A FAIRLY AND ACCURATELY DEPICT

16   THE AREA OF THE ELBOW?

17   A.   YES, SIR.

18             MR. BLANKENSHIP:  MOVE TO ADMIT GOVERNMENT'S

19   EXHIBIT 2A.

20             MR. DEMIK:  NO OBJECTION.

21             THE COURT:  RECEIVED.

22             (**EXHIBIT NO. 2A RECEIVED INTO EVIDENCE**)

23   BY MR. BLANKENSHIP:

24   Q.   NOW, WITH RESPECT TO GOVERNMENT'S EXHIBIT 2A, YOU

25   INDICATED THAT YOU ARRIVED TO THE ELBOW AREA AND YOU OBSERVED

1    AGENT LAMBERT ALREADY THERE?

2    A.   YES.  WHEN I GOT TO THE ELBOW, AGENT LAMBERT HAD ALREADY

3    GOTTEN THERE.  AND HE HAD TWO INDIVIDUALS WITH HIM WHO HE WAS

4    DETAINING.

5    Q.   WHAT DID YOU DO AFTER YOU GOT THERE?

6    A.   I ASKED HIM IF -- BECAUSE THE SCOPE HAD CALLED OUT FOUR

7    INDIVIDUALS, AND HE ONLY HAD TWO.  SO I ASKED WHERE THE OTHERS

8    HAD GONE.

9    Q.   WHAT HAPPENED THEN?

10   A.   HE SAW AT LEAST ONE MORE RUN TO THE NORTH AROUND THIS

11   CORNER ACTUALLY BETWEEN THE LEVEE AND THE TERTIARY FENCE HERE,

12   RUNNING NORTHBOUND (INDICATING).

13   Q.   YOU JUST POINTED TO AN AREA ON GOVERNMENT'S EXHIBIT 2A

14   THAT IS IN THE RIGHTMOST OR RIGHT IN THE MIDDLE BUT DIRECTLY

15   ABOVE THE GOVERNMENT'S EXHIBIT STICKER, AND YOU'RE INDICATING

16   A FENCE LOCATED ON GOVERNMENT'S EXHIBIT 2A?

17   A.   YES, SIR.  THIS BEND IN THE ROAD, THE FENCE LIKEWISE

18   MAKES A 90-DEGREE TURN RIGHT HERE (INDICATING).  THE

19   INDIVIDUAL WAS RUNNING AROUND THIS CORNER THAT YOU CANNOT SEE

20   IN BETWEEN THE LEVEE AND THE FENCE (INDICATING).

21   Q.   YOU'RE SAYING THAT THERE'S A LEVEE.

22           IS THAT ACTUALLY WHAT THE ROAD SITS ON TOP OF?

23   THAT'S THE LEVEE YOU'RE TALKING ABOUT?

24   Q.   THAT'S INDICATED IN GOVERNMENT'S EXHIBIT 2A?

25   A.   YES, SIR.

12

1    Q.   CAN YOU JUST PUT YOUR FINGER RIGHT THERE ON WHAT WOULD BE

2    CONSIDERED THE LEVEE.

3    A.   YES, SIR.   THIS GRAVEL ROAD RIGHT HERE IS THE LEVEE

4    (INDICATING).

5    Q.   NOW, AFTER YOU ARRIVED AND RECEIVED INFORMATION FROM

6    AGENT LAMBERT, WHERE DID YOU GO?

7    A.   I BEGAN RIDING ON THAT LEVEE ROAD TO THE NORTH IN THE

8    DIRECTION THAT HE INDICATED.

9    Q.   AND WHAT HAPPENED WHEN YOU BEGAN RIDING NORTH?

10   A.   AS I ROUNDED THE CORNER, I COULD SEE AN INDIVIDUAL

11   RUNNING NORTHBOUND.   AND JUST AFTER I SAW HIM, I OBSERVED THAT

12   HE HAD DROPPED TO THE GROUND.   AND IT LOOKED LIKE HE WAS

13   HIDING IN SOME TUMBLEWEEDS OR SOME BRUSH THAT WAS LAYING RIGHT

14   THERE.

15   Q.   WHAT DID YOU DO WHEN YOU OBSERVED HIM IN THE TUMBLEWEEDS?

16   A.   MY LIGHTS WERE ON HIM.   WITH THE AID OF MY LIGHTS, I WAS

17   ABLE TO SEE THROUGH THE BRUSH AND SEE SOME CLOTHING AND STUFF

18   LAYING THERE.   IT TURNED OUT TO BE AN INDIVIDUAL LAYING THERE

19   IN THE BRUSH.

20   Q.   WHAT DID YOU DO AT THAT POINT?

21   A.   I BEGAN TO GET OFF MY ATV.   I ACTUALLY TOOK ONE STEP OFF,

22   AND THE INDIVIDUAL JUMPED UP AND BEGAN RUNNING TO THE WEST AND

23   STOPPED, WENT ACROSS THE LEVEE, AND STARTED ANGLING

24   SOUTH/SOUTHWEST.

25   Q.   HE HAD ACTUALLY RAN BACK UP TO THE GRAVEL ROAD FROM THE

13

1    FENCE AREA?

2    A.    YES, SIR.

3    Q.    THEN INTO THE FIELD, YOU SAID?

4    A.    YES.

5    Q.    WHAT DID YOU DO WHEN YOU OBSERVED THAT?

6    A.    WHEN HE FIRST JUMPED UP, I YELLED "HEY, U.S. BORDER

7    PATROL.  WHERE ARE YOU GOING?  STOP."  AND HE CONTINUED AND

8    DID NOT RESPOND AT ALL TO MY COMMANDS.

9    Q.    SO DID YOU THEN BEGIN TO PURSUE THAT INDIVIDUAL?

10   A.    YES.  I GOT BACK ON MY ATV AND PURSUED HIM TO THE FIELD

11   TO THE WEST/SOUTHWEST.

12   Q.    WHAT HAPPENED WHEN YOU PURSUED HIM INTO THE FIELD?

13   A.    I WAS ABLE TO QUICKLY CATCH UP WITH HIM.  AS I STARTED TO

14   GET OFF AND GRAB AHOLD OF HIM, WE COLLIDED WITH EACH OTHER.

15   WHETHER HE TURNED MY DIRECTION OR BECAUSE OF THE TERRAIN, I'M

16   NOT SURE.  BUT HE MADE CONTACT WITH THE RIGHT -- I'M SORRY --

17   THE LEFT FRONT FENDER OF MY ATV, TRIPPED UP, AND FELL.

18   Q.    WHAT HAPPENED AFTER THAT?

19   A.    I JUMPED ON MY ATV AND DETAINED HIM, PUT HANDCUFFS ON

20   HIM.

21   Q.    AT THAT POINT WERE YOU ABLE TO LOOK AT HIM AND OBSERVE

22   THIS FELLOW?

23   A.    YES, SIR.

24   Q.    DID YOU THEN INTERACT WITH HIM?

25   A.    YES, SIR, I DID.  I ASKED HIM FIRST IF HE WAS OKAY, IF HE

14

1    NEEDED MEDICAL ATTENTION, AND WHY HE WAS RUNNING.  I ASKED HIM

2    WHY HE WAS RUNNING.

3    Q.   WHAT HAPPENED AFTER YOU HAD THAT INTERACTION?

4    A.   HE TOLD ME THAT HE WAS OKAY, THAT HE DIDN'T NEED MEDICAL

5    ATTENTION, THAT I HAD RUN OVER HIM AND THAT HIS LEG WAS

6    INJURED BUT THAT HE WAS OKAY.  I ASKED HIM IF HE WAS WELL

7    ENOUGH TO WALK OVER TO THE LEVEE.  AT THIS POINT, I'D SEEN MY

8    PARTNER WITH THE OTHER TWO INDIVIDUALS WALKING NORTH ALONG THE

9    LEVEE.

10   Q.   WAS HE OKAY ENOUGH TO WALK?

11   A.   YES, SIR, HE WAS.

12   Q.   WHAT LANGUAGE WERE YOU USING WHILE YOU WERE INTERACTING

13   WITH HIM?

14   A.   BOTH SPANISH AND ENGLISH.  I STARTED OFF A LITTLE BIT IN

15   SPANISH AND THEN NOTICED THAT HE SPOKE ENGLISH AND UNDERSTOOD

16   ENGLISH AND THEN SWITCHED OVER TO ENGLISH.

17   Q.   AND THE INDIVIDUAL THAT YOU APPREHENDED IN THE EARLY

18   MORNING HOURS OF OCTOBER 15TH, 2007, DO YOU SEE HIM SITTING IN

19   THE COURTROOM TODAY?

20   A.   YES, SIR, I DO.

21   Q.   CAN YOU PLEASE INDICATE FOR THE COURT BY DESCRIBING WHERE

22   HE'S SITTING AND POINT TO HIM.

23   A.   YES, SIR.

24        HE'S SITTING OVER THERE NEXT TO DEFENSE COUNSEL AND

25   IN BETWEEN DEFENSE COUNSEL AND THE INTERPRETER.

15

1           THE COURT:  THE RECORD WILL SHOW THAT AGENT MILLER

2    HAS IDENTIFIED MR. MARTINEZ.

3           MR. BLANKENSHIP:  THANK YOU, YOUR HONOR.

4    BY MR. BLANKENSHIP:

5    Q.   AFTER THAT INTERACTION IN THE FIELD, YOU ASKED HIM IF HE

6    WAS ABLE TO WALK.

7           WHAT DID HE DO AFTER YOU ASKED HIM IF HE COULD WALK

8    BACK UP TO THE LEVEE ROAD?

9    A.   WE BOTH WALKED TO THE LEVEE ROAD.  I FOLLOWED HIM ON MY

10   ATV WHILE HE WALKED, AND WE MET UP WITH AGENT LAMBERT AND THE

11   OTHER TWO OTHER INDIVIDUALS THAT HE HAD APPREHENDED.

12   Q.   THE AREA THAT YOU SAID THAT YOU WERE TRYING TO APPREHEND

13   OR CHASING THE DEFENDANT, IS THAT LOCATED OR INDICATED ON

14   GOVERNMENT'S EXHIBIT 2A?

15   A.   YES, SIR.  IT'S KIND OF HARD TO SEE FROM HERE BECAUSE THE

16   LEVEE ITSELF FROM THIS PICTURE OBSCURES, BUT THERE'S A BRUSH

17   LINE HERE (INDICATING) AND THEN A FIELD -- A LIGHT-BROWN SANDY

18   AREA.  IT WAS IN THIS LIGHT-BROWN SANDY AREA VERY CLOSE TO THE

19   LEVEE, MAYBE 30 OR 40 YARDS TO THE WEST OF THE LEVEE.

20   Q.   SO THAT WOULD HAVE BEEN -- ON GOVERNMENT'S EXHIBIT 2A,

21   THE ROAD ACTUALLY TURNS TO THE NORTH, AND IT WOULD HAVE BEEN

22   ON THE WEST SIDE OF THAT ROAD?

23   A.   YES.

24   Q.   YOU HAD TO PURSUE HIM FROM THE EAST, OVER THE ROAD, AND

25   ONTO THE WEST TO THE FIELD?

16

1    A.    YES.

2    Q.    AFTER YOU GOT BACK UP TO THE LEVEE ROAD, WERE YOU THEN

3    ABLE TO MEET UP WITH AGENT LAMBERT?

4    A.    YES.  I MET UP WITH AGENT LAMBERT, AND I TOLD HIM ABOUT

5    THE CIRCUMSTANCES OF THE ARREST; THAT THE INDIVIDUAL WAS

6    CLAIMING THAT I HAD RUN OVER HIM AND THAT I KNEW THAT I HAD

7    MADE CONTACT WITH MY ATV WITH HIM.  AGENT LAMBERT THEN ASKED

8    HIM IF HE NEEDED MEDICAL ATTENTION, IF HE NEEDED THE

9    PARAMEDICS OR AN EMT TO COME AND CHECK HIM OUT.

10   Q.    DID YOU OBSERVE HIS RESPONSE TO THAT QUESTION?

11   A.    YES, SIR.

12   Q.    WHAT DID HE RESPOND?

13   A.    HE SAID, "IF I CAN GO BACK TO MEXICO RIGHT NOW, I DON'T

14   NEED ANY MEDICAL ATTENTION."

15           MR. DEMIK:  OBJECTION; HEARSAY.

16           THE COURT:  OVERRULED.

17   BY MR. BLANKENSHIP:

18   Q.    WHAT HAPPENED AFTER THAT?

19   A.    I EXPLAINED TO HIM THAT THAT'S NOT THE WAY THAT IT WORKS.

20   THAT HE HAD BEEN APPREHENDED.  AND IF HE WAS FOUND TO BE IN

21   THE COUNTRY ILLEGALLY, THAT HE WOULD HAVE TO GO TO THE STATION

22   FOR FURTHER PROCESSING.

23   Q.    AND AFTER THIS, DID YOU THEN ASK HIM SOME QUESTIONS

24   RELATED TO HIS NATIONALITY AND CITIZENSHIP?

25   A.    YES, SIR, I DID.

1    Q.   WHAT DID YOU ASK HIM?

2    A.   I ASKED HIM WHAT COUNTRY HE WAS A CITIZEN, TO WHICH HE

3    REPLIED "MEXICO."  AND THEN I ASKED IF HE HAD ANY DOCUMENTS

4    THAT WOULD ALLOW HIM TO ENTER OR BE IN THE COUNTRY LEGALLY, TO

5    WHICH HE ANSWERED, NO, THAT HE DIDN'T HAVE ANY PAPERS.  AND

6    THEN I PROCEEDED TO ASK HIM HIS NAME.

7    Q.   DID HE ACTUALLY TELL YOU HIS NAME?

8    A.   YES, SIR.  HE GAVE ME THE NAME JOSE PEREZ-RUIZ.

9         MR. DEMIK:  OBJECTION; 3501, HEARSAY.

10         THE COURT:  OVERRULED.

11   BY MR. BLANKENSHIP:

12   Q.   AFTER THAT INTERACTION, WHAT HAPPENED?

13   A.   AFTER THAT INTERACTION, THE TRANSPORT AGENT HAD ALREADY

14   BEEN CALLED FOR THE INDIVIDUALS THAT AGENT LAMBERT HAD

15   APPREHENDED.  SO WHILE WE WERE DOING THIS INTERVIEW, THE

16   TRANSPORT AGENT HAD SHOWED UP WITH HIS VEHICLE, AND HE WAS

17   SEARCHED FOR ANY KIND OF WEAPONS OR CONTRABAND AND THEN PLACED

18   IN THE VEHICLE AND TAKEN TO THE IMPERIAL BEACH STATION FOR

19   FURTHER PROCESSING.

20   Q.   NOW, AFTER THE TRANSPORT WAS ARRANGED AND MADE TO THE

21   IMPERIAL BEACH BORDER PATROL STATION, DID YOU HAVE ANY FURTHER

22   INVOLVEMENT IN THE INVESTIGATION OF THIS INCIDENT AND THE

23   ARREST?

24   A.   YES.  I COMPLETED A REPORT FOR THIS CASE.

25   Q.   DID YOU HAVE ANY OTHER INVOLVEMENT?

1    A.    NO, SIR.

2            MR. BLANKENSHIP:  MAY I HAVE JUST ONE MOMENT?

3            THE COURT:  YES.

4            MR. BLANKENSHIP:  YOUR HONOR, I HAVE NO FURTHER

5    QUESTIONS.

6            THE COURT:  YOU MAY CROSS-EXAMINE, MR. DEMIK.

7            MR. DEMIK:  MAY I HAVE ONE SECOND, YOUR HONOR?

8            THE COURT:  OF COURSE.

9            MR. DEMIK:  YOUR HONOR, I'D LIKE FOR THE RECORD TO

10   RENEW THE OBJECTIONS I MADE PREVIOUSLY, SPECIFICALLY WITH

11   REGARD TO THE COMPETENCY ISSUE.

12           THE COURT:  OVERRULED.

13           MR. DEMIK:  THANK YOU.

14                        **CROSS-EXAMINATION**

15   **BY MR. DEMIK:**

16   Q.    AGENT, I WANT TO ASK YOU FIRST A LITTLE BIT THE AREA

17   CALLED THE ELBOW.

18   A.    YES, SIR.

19   Q.    THAT'S IN GOVERNMENT'S EXHIBIT -- I BELIEVE IT'S 1A.

20   A.    YES, SIR.

21   Q.    THAT'S -- IT'S CALLED AN ELBOW BECAUSE IT'S SHAPED --

22   LOOKS LIKE IN GOVERNMENT'S 1A IT'S SORT OF SHAPED LIKE THE

23   CURVATURE OF AN ELBOW?

24   A.    YES, SIR.

25   Q.    IF YOU COULD LOOK AT IT WITH ME, THAT AREA TO THE SOUTH

1    AND TO THE WEST, THAT'S PRETTY MUCH FIELDS; RIGHT?

2    A.   YES, SIR.  IT'S THE TIJUANA RIVER CHANNEL, AND WE KEEP IT

3    PLOWED TO BETTER AID OUR ABILITIES TO PATROL THAT AREA AND SEE

4    INTO THAT AREA.

5    Q.   YOU KEEP IT PLOWED OF THINGS LIKE BRUSHES AND

6    TUMBLEWEEDS?

7    A.   YES, SIR.

8    Q.   THAT'S SO PEOPLE CAN'T HIDE THERE; RIGHT?

9    A.   YES, SIR.

10   Q.   THERE'S ALSO FLOODLIGHTS THAT SHINE ON THAT AREA;

11   CORRECT?

12   A.   YES, SIR.  THERE ARE DARK SPOTS, BUT THERE ARE

13   FLOODLIGHTS NORTH OF THE NORTH LEVEE THERE THAT SHINE INTO

14   THAT AREA.

15   Q.   THEY SHINE INTO THE FIELD AREA?

16   A.   YES, SIR.

17   Q.   AND AT THAT TIME YOU ARRESTED MR. MARTINEZ, IT WAS ABOUT

18   5:30 A.M.

19   A.   YES, SIR.  I BELIEVE 5:20.

20   Q.   AND THOSE FLOODLIGHTS WERE ON?

21   A.   YES, SIR, THEY WERE.

22   Q.   IT'S ALSO SORT OF SUNRISE ABOUT THAT TIME; RIGHT?

23   A.   YES, IT'S BEGINNING TO GET LIGHT.

24   Q.   ON GOVERNMENT'S EXHIBIT 1A, YOU REFER TO THE YELLOW LINE.

25        THAT'S THE INTERNATIONAL BORDER BETWEEN MEXICO AND

20

1    THE UNITED STATES?

2    A.    JUST A LITTLE BIT TO THE NORTH OF THAT LINE.  YOU CAN SEE

3    THE LINE GOES ACROSS THE HOUSES IN THAT NEIGHBORHOOD, AND THEN

4    THERE'S A LIGHT LOOKING -- IT LOOKS LIKE A ROAD THAT GOES INTO

5    MEXICO, AND THEN DIRECTLY TO NORTH OF THAT ROAD IS THE PRIMARY

6    FENCE.

7    Q.    AND THOSE HOUSES, THAT'S BECAUSE THERE IS A RESIDENTIAL

8    AREA ON THE MEXICAN SIDE OF THE FENCE; RIGHT?

9    A.    THAT IS CORRECT.

10   Q.    AND THAT RESIDENTIAL AREA HAS HOUSES; RIGHT?

11   A.    YES.

12   Q.    PEOPLE LIVE THERE?

13   A.    YES, SIR.

14   Q.    OKAY.  AND THERE IS ONE FENCE BEFORE THE -- I'M SORRY.

15   REMIND ME, WHAT'S THE WHITE FENCE?

16   A.    IT'S CALLED A BOLLARD FENCE.

17   Q.    THANK YOU.

18        BEFORE THE BOLLARD, THERE'S A FENCE ON THE MEXICAN

19   SIDE; RIGHT?

20   A.    IT'S ACTUALLY THE ACTUAL DIVIDING LINE.  THE

21   INTERNATIONAL BOUNDARY IS WHERE THAT FENCE LIES.

22   Q.    AND AFTER THAT FIRST FENCE, THEN THERE'S THE BOLLARD?

23   A.    YES, SIR.

24   Q.    HOW MANY YARDS NORTH DO THOSE FIELDS GO IN GOVERNMENT'S

25   EXHIBIT A FROM THE BOLLARD AS FAR NORTH AS THAT FIELD GOES?

21

1    HOW FAR APPROXIMATELY IS THAT, WOULD YOU SAY?

2    A.   TO THE ELBOW AREA, IT'S APPROXIMATELY 200 TO 250 YARDS.

3    BUT THEN THAT FIELD AREA THERE, AS YOU CAN SEE, WHERE IT TURNS

4    NORTH ON THE ELBOW, IT EXTENDS NORTH PROBABLY ANOTHER 800

5    METERS, APPROXIMATELY A HALF-MILE.

6    Q.   AND THAT'S THE AREA THAT WE'RE TALKING ABOUT THAT'S

7    FIELDS; RIGHT?

8    A.   YES, SIR.  JUST -- PROBABLY ABOUT 50 TO 75 YARDS NORTH OF

9    THE ELBOW AND ABOUT 30 TO 40 YARDS WEST OF THE LEVEE IS WHERE

10   THE APPREHENSION WAS MADE IN THE FIELD.

11   Q.   THERE'S NO BUILDINGS IN THAT AREA; CORRECT?

12   A.   NO, NOT IN THE FIELDS.

13   Q.   IT'S BASICALLY ROCKS AND I THINK YOU REFERRED TO A

14   LIGHT-BROWN SANDY AREA?

15   A.   YES, SIR.  IT'S A FIELD WHERE THEY GROW SOD.  AND WHEN

16   THERE'S NO SOD THERE, WHEN THEY PLOW IT, IT'S JUST THE FRESH

17   DIRT.

18   Q.   I'M GOING TO SHOW YOU WHAT I'M MARKING AS GOVERNMENT'S

19   EXHIBITS A THROUGH F.  I'M GOING TO ALLOW GOVERNMENT COUNSEL

20   TO LOOK AT THOSE AND ASK YOU IF YOU RECOGNIZE THEM JUST TO

21   HAVE SOME RECORD.  SO I'LL HAND THEM ALL TO YOU AT ONCE, IF

22   THAT'S ALL RIGHT.  IF YOU COULD JUST TAKE A LOOK AT THOSE.

23   A.   YES, SIR.

24   Q.   WHAT DO DEFENDANT'S EXHIBITS A THROUGH F DEPICT?

25   A.   IT SHOWS AREAS IN AND AROUND THE ELBOW AREA.

1    Q.   AND ARE THOSE PHOTOGRAPHS THE SAME GENERAL AREA WHERE YOU

2    APPREHENDED MR. MARTINEZ?

3    A.   YES, SIR.  MOST OF THEM ARE LOOKING BACK TO THE SOUTH.  I

4    WAS JUST A LITTLE BIT NORTH OF THIS AREA.

5    Q.   OKAY.  AND IT'S SAFE TO SAY THE AREA THAT'S NORTH OF

6    THERE IS THE SAME TERRAIN?

7    A.   YES, SIR.  IT'S PLOWED FIELDS.  THAT'S THE ONLY

8    DIFFERENCE, WHERE THIS IS NOT REGULARLY MAINTAINED FOR GROWING

9    SOD AND STUFF, THE OTHER AREA.  SO WHERE YOU SEE THE TIRES AND

10   THE TRASH, THERE'S NOT THAT KIND OF AREA, THAT KIND OF DEBRIS

11   IN THE AREA WHERE I MADE THE APPREHENSION.

12   Q.   SO IF WE LOOK BACK TO GOVERNMENT'S EXHIBIT 1A, THOSE

13   PHOTOGRAPHS ARE OF THE SORT OF ROCKY AREA THAT RUNS EAST TO

14   WEST; RIGHT?

15   A.   YES, SIR.

16   Q.   AND THE AREA THAT YOU WERE JUST REFERRING TO IS THAT AREA

17   A LITTLE BIT NORTH, WHICH ON GOVERNMENT'S 1A ALMOST LOOKS LIKE

18   FIELDS?

19   A.   YES.  THAT GREEN FIELD -- THE FURTHEST SOUTH GREEN FIELD

20   THERE IS ACTUALLY WHERE I MADE THE APPREHENSION INSIDE THAT

21   FIELD THERE.  BUT AT THE TIME IT HAD BEEN PLOWED.  THERE WAS

22   NO SOD THERE.  SO IT WAS ALL BROWN AND SANDY.

23   Q.   OKAY.  I SEE.

24        NOW, COULD YOU GET GOVERNMENT'S EXHIBIT 1A.  I WANT

25   TO MAKE SURE WE HAVE THAT ON THE RECORD.  COULD YOU CIRCLE

23

1    THAT GREEN FIELD.  DID YOU ALREADY DO IT?

2    A.   NO, SIR.

3    Q.   COULD YOU CIRCLE THE GREEN FIELD ON GOVERNMENT'S 1A TO

4    SHOW WHERE YOU'RE TALKING ABOUT.

5    A.   YES, SIR.

6    Q.   COULD YOU PUT AN A IN THAT CIRCLE FOR APPREHENSION.

7    A.   YES, SIR.

8    Q.   THANK YOU.

9           SO THIS AREA, THE ONE THAT YOU CIRCLED A, THAT IS

10   WHAT YOU SAID WAS PLOWED FOR SOD; RIGHT?

11   A.   YES, SIR.

12   Q.   SO IT'S ACTUALLY LESS ENCUMBERED THAN THE DEFENDANT'S A

13   THROUGH F?

14   A.   YES.  THERE'S NOT AS MUCH DEBRIS AND THAT KIND OF --

15   Q.   THAT'S WHAT I MEANT BY "ENCUMBERED."  I WAS LOOKING FOR A

16   BETTER WORD.

17          THERE'S NOT THAT MUCH TRASH, TUMBLEWEED, BRUSHES?

18   A.   CORRECT.

19   Q.   THERE'S LESS OF THAT WHERE MR. MARTINEZ WAS

20   APPREHENDED?

21   A.   YES, SIR.

22   Q.   I WANT TO ASK YOU A LITTLE BIT ABOUT WHEN YOU APPREHENDED

23   MR. MARTINEZ.

24          YOU WROTE A REPORT IN THIS CASE?

25   A.   YES, I DID.

24

1  Q.   AND THIS WAS A FORM I-213?

2  A.   YES, SIR.

3  Q.   AND IT WAS FOUR PAGES LONG?

4  A.   YES, SIR.

5  Q.   IN YOUR REPORT, YOU STATE THAT MR. MARTINEZ WAS RUNNING

6  IN A ZIGZAGGING PATTERN?

7  A.   YES, SIR.

8  Q.   YOU ALSO MADE REFERENCE, I THINK AT LEAST THREE TIMES, TO

9  HIM RUNNING IN AN ERRATIC COURSE?

10  A.   YES, SIR.

11  Q.   YOU USED THE WORD "ERRATIC"?

12  A.   YES, SIR.

13  Q.   I WANT YOU TO ASK YOU A LITTLE BIT ABOUT THAT.

14          SO HE WASN'T RUNNING IN A STRAIGHT LINE?

15  A.   NO, SIR, IT WASN'T A STRAIGHT LINE.

16  Q.   HE WAS RUNNING IN AN UNUSUAL MANNER?

17  A.   I MEAN, IT WASN'T LIKE HE WAS RUNNING CRAZILY OR

18  ANYTHING.  I WAS LIKE HE WAS TRYING TO AVOID BEING

19  APPREHENDED.  AS I WAS PURSUING HIM, HE WAS CUTTING MORE

20  SOUTHWEST, AND THEN HE WOULD CUT BACK SOUTHEAST.  AND THEN AS

21  I GOT CLOSER, HE WAS TRYING TO GET AWAY, IS WHAT IT APPEARED

22  TO BE.

23  Q.   SO WHEN YOU FIRST ENCOUNTERED HIM, HE WAS HEADED NORTH?

24  A.   YES, SIR.

25  Q.   AND THEN WHEN HE WAS RUNNING IN THE ZIGZAG PATTERN, HE

1    WAS RUNNING SOUTH AND SOUTHWEST?

2    A.    SOUTH, SOUTHWEST, SOUTHEAST.

3    Q.    IN VARIOUS DIRECTIONS?

4    A.    YES, SIR.

5    Q.    WHEN YOU WERE ON YOUR ATV AND YOU COLLIDED, YOU HAD

6    SLOWED DOWN; RIGHT?

7    A.    YES, SIR.  I BEGAN TO SLOW DOWN BECAUSE I WAS GETTING

8    CLOSE TO HIM, AND I WAS GOING TO JUMP OFF AND EITHER GIVE HIM

9    A PUSH OR TRY TO GET HIM TO WHERE I COULD GET HIM DOWN AND GET

10   SOME HANDCUFFS ON HIM AND DO MY JOB.

11   Q.    AND BECAUSE HE WAS RUNNING ERRATICALLY, YOUR ATV COLLIDED

12   WITH HIS LEG; RIGHT?

13   A.    YES, SIR.

14   Q.    IT'S LIKE HE RAN INTO YOU?

15   A.    YES, SIR.  LIKE I SAID, I DON'T KNOW IF IT WAS BECAUSE OF

16   THE WAY HE WAS TURNING OR BECAUSE I WAS TRYING TO GET CLOSE TO

17   HIM OR WHAT EXACTLY HAPPENED THERE.  BUT HE DID MAKE CONTACT

18   WITH THE FRONT FENDER OF MY VEHICLE.

19   Q.    OKAY.  WHAT YOU'RE SAYING IS BECAUSE HE WAS RUNNING

20   ERRATICALLY, YOU'RE NOT SURE EXACTLY WHAT CAUSED THAT

21   COLLISION?

22   A.    I'M ASSUMING THAT THAT'S WHAT CAUSED THE COLLISION,

23   BECAUSE HE WAS RUNNING ERRATICALLY, YES, SIR.

24   Q.    BECAUSE OF THE NATURE THAT HE WAS RUNNING IN THIS AREA,

25   IT LED HIM, IN FACT, TO COLLIDE WITH YOUR ATV?

26

1    A.    YES, SIR.

2    Q.    AND THE ATV IS HARD TO MISS?  YOU HAD YOUR LIGHTS ON?

3    A.    YES, SIR, I DID.

4    Q.    THE FLOODLIGHTS ARE ON BY THIS TIME, AND THE LIGHT IS

5    ALMOST UP.

6          HE COULD SEE YOU; RIGHT?

7    A.    YES, SIR.  HE WAS RUNNING AWAY FROM ME.  HE TURNED BACK

8    LOOKING OVER HIS SHOULDER, BUT --

9    Q.    AT ONE POINT WHEN HE ZIGZAGGED, THAT'S WHEN HE RAN INTO

10   YOUR ATV?

11   A.    YES, SIR.

12   Q.    THEN HE STOPPED; RIGHT?

13   A.    YES, SIR.  IT KIND OF TRIPPED HIM UP WHEN HIS LEG HIT THE

14   FENDER.  IT TRIPPED HIM UP, AND HE FELL TO THE GROUND.

15   Q.    AND YOUR REPORT STATES THAT HE WAS LYING IN A PRONE

16   POSITION?

17   A.    YES, SIR.

18   Q.    HE'S FLAT ON THE GROUND?

19   A.    YES, SIR.

20   Q.    WHAT YOU DID THEN, YOU PUT HANDCUFFS ON HIM; RIGHT?

21   A.    YES, SIR, I DID.

22   Q.    AND THEN YOU BROUGHT HIM FROM THE A CIRCLE WHERE YOU

23   APPREHENDED HIM OVER TO THE ACTUAL POINT OF THE ELBOW?

24   A.    NO, NOT THE ELBOW.  MY PARTNER HAD BEGAN WALKING THE

25   OTHER TWO INDIVIDUALS NORTH ON THE LEVEE.  SO HE WAS JUST 30

1    TO 40 YARDS AWAY ON THE LEVEE.

2    Q.    GOING NORTH ON THAT LEVEE ROAD?

3    A.    YES, SIR.

4    Q.    OKAY.  AND THAT'S A SHORT DISTANCE; RIGHT?

5    A.    YES, SIR.

6    Q.    AND WHEN YOU BROUGHT HIM WITH THE OTHER TWO

7    INDIVIDUALS -- NO, I'M SORRY.  LET ME BACK UP.

8         AFTER YOU HANDCUFFED HIM, YOU ASKED HIM WHY HE WAS

9    RUNNING; RIGHT?

10   A.    YES, SIR.

11   Q.    DID HE ANSWER YOU?

12   A.    NO, I DON'T REMEMBER HIM ANSWERING THAT QUESTION.

13   Q.    AND THEN WHEN YOU TOOK HIM OVER WITH THE OTHER TWO

14   INDIVIDUALS, HE ASKED YOU IF YOU WOULD RELEASE HIM; RIGHT?

15   A.    NO, SIR.  I HAD ASKED HIM -- I TOLD MY SUPERVISOR WHAT

16   HAD HAPPENED, AND THAT'S HOW MY SUPERVISOR ASKED HIM IF HE

17   NEEDED MEDICAL ATTENTION.  AGAIN, THAT WAS THE SECOND TIME I'D

18   ASKED HIM IN THE FIELD, AND THEN MY BOSS HAD ASKED HIM ONCE WE

19   GOT TO THE LEVEE.

20   Q.    SO AT THE LEVEE, HE ASKED "WILL YOU RELEASE ME?"

21   A.    YES, SIR.  THEN WHEN HE SAID, "IF I CAN RETURN TO MEXICO

22   RIGHT NOW, I'LL GO BACK TO MEXICO RIGHT NOW.  THEN I DO NOT

23   NEED ANY MEDICAL ATTENTION."

24   Q.    SO "IF YOU RELEASE ME"?

25   A.    YES, SIR.

1   Q.   YOU SAID, "WE AREN'T GOING TO RELEASE YOU"?

2   A.   THAT'S WHAT I SAID, "THAT'S NOT HOW IT WORKS."

3   Q.   AND AFTER THAT POINT, YOU DID WHAT'S CALLED FIELD

4   QUESTIONING; RIGHT?

5   A.   YES, SIR.

6   Q.   YOU ASKED HIM QUESTIONS; RIGHT?

7   A.   YES, SIR.  HIS CITIZENSHIP, HIS NAME, WHERE HE WAS BORN,

8   MOTHER AND FATHER.

9   Q.   IMMIGRATION QUESTIONS?

10  A.   YES, SIR.

11  Q.   TO DETERMINE HIS IMMIGRATION STATUS?

12  A.   YES, SIR.

13  Q.   AND YOU ALSO ASKED HIM IF HE HAD ANY PAPERS?

14  A.   YES, SIR.

15  Q.   OKAY.  I DON'T KNOW IF YOU FOUND OUT, BUT LATER HE WAS

16  TAKEN TO THE HOSPITAL; RIGHT?

17  A.   YES, SIR.  I BELIEVE AFTER WE GOT TO THE STATION AND IT

18  WAS DETERMINED THAT THERE HAD TO BE A MORE EXTENSIVE REPORT

19  DONE, THEN HE SAID HE WAS GOING TO NEED TO SEE THE DOCTOR FOR

20  HIS LEG.

21  Q.   AND HE DID SEE A DOCTOR?

22  A.   YES, SIR.

23  Q.   THAT DOCTOR DIAGNOSED HIM WITH A SPRAINED ANKLE?

24          MR. BLANKENSHIP:  OBJECTION.

25          THE COURT:  THE OBJECTION'S SUSTAINED.  IT'S

29

1    HEARSAY.

2    BY MR. DEMIK:

3    Q.   ARE YOU AWARE OF ANY MEDICAL INJURIES THAT MR. MARTINEZ

4    WAS DIAGNOSED WITH AT THE HOSPITAL?

5    A.   NO.  JUST THE NEXT DAY, I INQUIRED AS TO WHAT WAS GOING

6    ON WITH THE CASE AND WAS ADVISED BY ANOTHER AGENT --

7              MR. BLANKENSHIP:  OBJECTION.

8              THE COURT:  THE OBJECTION'S SUSTAINED.

9    BY MR. DEMIK:

10   Q.   YOU SAID A MORE IN-DEPTH REPORT.

11             DID YOU WRITE ANY OTHER REPORTS IN THIS CASE?

12   A.   NO, SIR.  JUST THE 213 REPORT AND THE PAPERWORK

13   ASSOCIATED WITH THE A FILE.

14   Q.   WHAT PAPERWORK IS THAT?

15   A.   THERE IS AN A-71, I-94, 9205.  JUST THOSE PAPERS THAT ARE

16   REQUIRED FOR THE A FILE, SIR.

17   Q.   AND YOU COMPLETED THOSE?

18   A.   YES, SIR, I DID.

19             MR. DEMIK:  IF YOU CAN GIVE ME ONE SECOND.  SORRY

20   FOR THE PAUSE.

21             THE WITNESS:  YES, SIR.

22                  (PAUSE IN PROCEEDINGS)

23   BY MR. DEMIK:

24   Q.   I WANT TO ASK YOU, IN YOUR OPINION, THIS IS A DIFFICULT

25   AREA -- IN YOUR TRAINING AND EXPERIENCE, THIS WOULD BE A

1    DIFFICULT AREA FOR SOMEONE TO ILLEGALLY ENTER THE UNITED

2    STATES.

3              WOULD THAT BE A FAIR STATEMENT?

4    A.    BECAUSE OF THE FENCES, YES, SIR.    THERE ARE MORE FENCES

5    IN THIS AREA THAN THERE ARE IN OTHER AREAS.

6    Q.    AND THERE ARE ALSO THE FLOODLIGHTS; RIGHT?

7    A.    CORRECT, SIR.

8    Q.    AND THERE'S ALSO THE FACT THAT THIS IS UP TO, LIKE, HALF

9    A MILE OF JUST FIELDS?

10   A.    YES, SIR.

11   Q.    THAT COMBINED WITH MR. MARTINEZ'S ERRATIC BEHAVIOR, WOULD

12   YOU SAY HIS CHANCES OF ENTERING THE UNITED STATES ILLEGALLY

13   WERE SLIM TO NONE?

14             MR. BLANKENSHIP:  OBJECTION, YOUR HONOR.

15             THE COURT:  ARE YOU ABLE TO QUANTIFY HOW LIKELY IT

16   IS SOMEBODY CAN GET IN AT ANY GIVEN TIME AT A CERTAIN PLACE

17   ALONG THE BORDER?

18             THE WITNESS:  A LOT OF THAT HAS TO DO WITH CHANCE

19   AND LUCK BECAUSE WITH THE E SCOPE OPERATOR AND THE DIFFERENT

20   INDIVIDUALS --

21             THE COURT:  WOULD YOU BE GUESSING IF YOU WERE TO TRY

22   TO GIVE MR. DEMIK SOME ODDS ON HOW LIKELY IT IS?

23             THE WITNESS:  YES, SIR.  IT WOULD JUST BE --

24             THE COURT:  THE OBJECTION IS SUSTAINED.  HE CAN'T

25   GUESS.

1    BY MR. DEMIK:

2    Q.   HOW LONG TOTAL WAS YOUR INTERACTION WITH MR. MARTINEZ,

3    WOULD YOU SAY, AS FAR AS CONVERSATION, WORDS?

4    A.   IN THE FIELD, PROBABLY NO LONGER THAN 15 MINUTES WE WERE

5    THERE.

6    Q.   AND YOU STATED THAT YOU SPOKE TO HIM IN BOTH ENGLISH AND

7    SPANISH?

8    A.   YES, SIR.

9    Q.   WHICH APPEARED TO BE BETTER TO YOU, HIS ENGLISH OR HIS

10   SPANISH?

11   A.   HE SEEMED TO UNDERSTAND ME BETTER IN ENGLISH.

12   Q.   AND THAT'S BECAUSE WHEN YOU WERE SPEAKING ENGLISH, YOU

13   WERE ASKING HIM QUESTIONS; RIGHT?

14   A.   YES, SIR.

15   Q.   AND MOST OF HIS REPLIES WERE "YES"?

16   A.   WELL, WHENEVER IT WENT TO THE MEDICAL TREATMENT QUESTION,

17   IT WAS, NO, HE DIDN'T NEED MEDICAL TREATMENT IF HE COULD BE

18   RETURNED TO MEXICO.  AND THEN TO HIS NAME, HE ANSWERED THOSE

19   QUESTIONS.  AND HIS NATIONALITY, MEXICO.

20            MR. DEMIK:  NO FURTHER QUESTIONS, YOUR HONOR.

21            THE COURT:  ANYTHING ELSE?

22            MR. BLANKENSHIP:  JUST BRIEFLY, YOUR HONOR.

23                   **REDIRECT EXAMINATION**

24   **BY MR. BLANKENSHIP:**

25   Q.   AGENT MILLER, DURING YOUR INTERACTION WITH THE DEFENDANT,

1    YOU SPOKE IN THE ENGLISH LANGUAGE?

2    A.   YES, SIR, I DID.

3    Q.   WHEN YOU WERE INTERACTING WITH THE DEFENDANT AND YOU

4    ASKED HIM QUESTIONS, DID HE GIVE APPROPRIATE RESPONSES TO YOUR

5    QUESTIONS?

6    A.   YES, SIR.  AS I SAID, IT SEEMED LIKE HE BETTER UNDERSTOOD

7    ME IN ENGLISH THAN MY SPANISH.

8              MR. DEMIK:  OBJECTION; SPECULATION.

9              THE COURT:  OVERRULED.  I THINK THAT'S A PROPER LAY

10   OPINION.

11             THE WITNESS:  WHEN I ORIGINALLY MADE THE ARREST, I

12   WAS SPEAKING TO HIM IN SPANISH.

13             AND THEN HE SAID IN ENGLISH "HE RAN OVER MY LEG."

14             I WAS, LIKE, "OH, THIS GUY SPEAKS ENGLISH."  SO THEN

15   I BEGAN SPEAKING TO HIM IN ENGLISH.

16             HE SEEMED TO UNDERSTAND AND ANSWER THOSE QUESTIONS

17   JUST FINE IN ENGLISH.

18   BY MR. BLANKENSHIP:

19   Q.   WERE YOU ABLE TO OBSERVE HIM FACE TO FACE?

20   A.   YES, SIR.

21   Q.   WERE YOU ABLE TO OBSERVE HIS BEHAVIOR?

22   A.   YES, SIR.

23   Q.   WERE YOU ABLE TO OBSERVE HIS SPEECH PATTERNS?

24   A.   YES, SIR.

25   Q.   HAVE YOU INTERACTED WITH PEOPLE ALONG THE BORDER ON

33

1    PREVIOUS OCCASIONS?

2    A.    YES, SIR, MANY TIMES.

3    Q.    WERE YOUR INTERACTIONS WITH THIS INDIVIDUAL IN ANY WAY

4    SUSPECT?

5             MR. DEMIK:  OBJECTION; VAGUE.

6             THE COURT:  SUSTAINED.

7    BY MR. BLANKENSHIP:

8    Q.    WERE YOU ABLE TO COMMUNICATE WITH HIM?

9    A.    YES, SIR.

10   Q.    WAS THAT COMMUNICATION IN ANY WAY MARKEDLY DIFFERENT THAN

11   TYPICAL COMMUNICATION WITH OTHER INDIVIDUALS?

12   A.    NO, SIR.

13   Q.    YOU HAD INDICATED THAT HE WAS RUNNING IN AN ERRATIC

14   MANNER?

15   A.    YES, SIR.

16   Q.    BE SPECIFIC.

17            WHAT ARE YOU TALKING WHEN YOU'RE SAYING, "ERRATIC"?

18   A.    YES, SIR.  PERHAPS "ZIGZAG" IS NOT THE BEST DESCRIPTION

19   BECAUSE HE WASN'T RUNNING WILDLY BACK AND FORTH ALL OVER THE

20   PLACE.  IT SEEMED LIKE HE WAS TRYING TO GET AWAY FROM MY ATV.

21   SO HE WOULD RUN TO THE SOUTHWEST.  AND THEN AS I WOULD CLOSE

22   IN TO THE SOUTHWEST, THEN HE WOULD CUT BACK TO THE SOUTHEAST.

23   AS I TURNED TO MEET HIM THERE, HE WOULD KIND OF TURN BACK MORE

24   TO THE SOUTH.  SO THAT'S HOW -- MORE OF HIS PATTERN OF

25   RUNNING.  AND AS I CLOSED IN AND GOT CLOSER, I WAS RIGHT ON

34

1    HIS HEEL, AND HE STARTED TO TURN.  AND THAT'S WHEN THE CONTACT

2    WAS MADE.

3    Q.    YOU HAD INDICATED THAT THE AREA OF THE APPREHENSION WAS A

4    PLOWED AREA?

5    A.    YES, SIR.

6    Q.    WAS THE SOIL SOFT?

7    A.    YES, SIR, VERY SOFT.

8    Q.    CAN YOU DESCRIBE THE EFFECT OF HAVING SOFT -- WHAT THE

9    SOFT SOIL EFFECT IS ON YOUR ATV OPERATIONS.

10   A.    YES, SIR.

11         FOR THE ATV, IT SLOWS THE ATV DOWN QUITE A BIT

12   BECAUSE YOU'RE BOGGING DOWN IN THE SOFT SAND.  ALSO, ANY KIND

13   OF -- THERE IS NO SHARP TURNING.  EVERYTHING TAKES A LITTLE

14   BIT LONGER, TO TURN AND TO STOP.  SO IT SLOWS THINGS DOWN

15   QUITE A BIT ON THE ATV, THE REACTIONS AND THE PERFORMANCE OF

16   THE VEHICLE.

17   Q.    WHEN YOU WERE TRYING TO CLOSE IN ON THE DEFENDANT, DID

18   THAT SOFT SAND AFFECT YOUR ABILITY TO ACTUALLY ACCOMPLISH

19   THAT?

20   A.    YES, SIR.  ABSOLUTELY.  THAT'S WHY HE WAS SO EFFECTIVE

21   WHEN HE WAS MAKING A CUT TO THE SOUTHWEST OR A CUT TO THE

22   SOUTHEAST.  IT WOULD TAKE ME A COUPLE SECONDS TO MAKE THE

23   CORRECTION TO CLOSE THE DISTANCE THAT HE HAD GAINED DURING

24   THAT TIME.

25         MR. BLANKENSHIP:  I HAVE NOTHING FURTHER.

1          THE COURT:  MR. DEMIK, ANYTHING ELSE?

2          MR. DEMIK:  BRIEFLY.

3                    **RECROSS-EXAMINATION**

4    **BY MR. DEMIK:**

5    Q.   THIS AREA THAT HE WAS TRYING TO GET AWAY FROM YOU, THAT'S

6    CLOSED IN BY AT LEAST TWO FENCES?

7    A.   TO THE EAST IN THE FIELD, YES.  THERE'S METAL FENCES TO

8    THE EAST.  TO THE WEST, IT'S JUST PROBABLY A HALF A MILE OF

9    FIELD.  THERE IS NO FENCE THAT WAY.  BACK TO THE SOUTH AGAIN

10   IS THE BOLLARD FENCE, THE SECONDARY FENCE, AND THE PRIMARY

11   FENCE.

12   Q.   SO WHAT BARRIERS ARE THERE TO THE WEST?

13   A.   TO THE WEST, THERE ARE NO BARRIERS.

14   Q.   THERE'S MOUNTAINS THERE?

15   A.   NO, SIR.

16   Q.   HOW DO YOU NORMALLY APPREHEND PEOPLE WHO HEAD WEST IN

17   THAT AREA?

18          MR. BLANKENSHIP:  OBJECTION, YOUR HONOR.

19          THE COURT:  OVERRULED.

20          YOU MAY ANSWER.

21          THE WITNESS:  YES, SIR.  INDIVIDUALS THAT HEAD WEST,

22   USUALLY THE SAME WAY AS WE APPROACH MOST INDIVIDUALS, THEY

23   GIVE UP.  THEY SEE THEY CAN'T GET AWAY FROM A VEHICLE.  SO

24   THEY PUT THEIR HANDS UP AND THEY STOP RUNNING AND COMPLY WITH

25   OUR COMMANDS AS WE GET CLOSE.

1 BY MR. DEMIK:

2 Q. SO WHEN YOU SAY THAT THEY REALIZE THAT THEY CAN'T GET

3 AWAY FROM A VEHICLE, THAT'S BECAUSE IT'S A WIDE OPEN SPACE;

4 RIGHT?

5 A. YES, SIR, BECAUSE AN ATV IS FASTER THAN AN INDIVIDUAL

6 RUNNING IN MOST CASES, IN MOST AREAS.

7    MR. DEMIK: NO FURTHER QUESTIONS.

8    THE COURT: ANYTHING ELSE?

9    MR. BLANKENSHIP: NOTHING FURTHER, YOUR HONOR.

10    THE COURT: AGENT MILLER, YOU MAY STAND DOWN.

11 YOU'RE EXCUSED AS A WITNESS.

12    THE WITNESS: YES, SIR.

13    THE COURT: THIS CONCLUDES THE DEPOSITION OF AGENT

14 MILLER.

15    ANYTHING ELSE FOR THE RECORD, GENTLEMEN, BEFORE WE

16 RECESS?

17    MR. DEMIK: I DO, YOUR HONOR.

18    FIRST, I'D LIKE TO MAKE A MOTION UNDER 3501 TO

19 EXCLUDE THE FIELD STATEMENTS BASED UPON VOLUNTARINESS AND

20 MIRANDA.

21    THE COURT: THE MOTION IS DENIED. THE MIRANDA

22 RIGHTS WERE NOT IN PLACE YET. HE WAS NOT IN CUSTODY. THE

23 CIRCUMSTANCES AS EXPLAINED BY AGENT MILLER DON'T IMPLICATE

24 VOLUNTARINESS TO ANY EXTENT THAT CAUSES ME TO THINK THE

25 DEFENDANT'S STATEMENTS WERE THE PRODUCT OF UNFAIR PRESSURE OR

1    FORCE.

2            IT'S TRUE THAT THERE WAS A COLLISION, APPARENTLY,

3    BETWEEN THE FRONT OF HIS ATV VEHICLE AND MR. MARTINEZ'S LEG.

4    BUT THAT ALONE DOESN'T CAUSE ME TO THINK THAT MR. MARTINEZ WAS

5    RESPONDING IN A COMPELLED MANNER TO ANY QUESTIONS THAT WERE

6    PUT TO HIM.  NOTHING IN THE CONTEXT OF INTERROGATION OF

7    MR. MARTINEZ HAS BEEN BROUGHT OUT IN THE QUESTIONING TODAY

8    THAT COMPELS A CONCLUSION.  SO THE MOTION IS DENIED.

9            ANYTHING ELSE?

10            MR. DEMIK:  NOT AT THIS TIME.

11            MR. BLANKENSHIP:  NOTHING FROM THE GOVERNMENT, YOUR

12    HONOR.

13            THE COURT:  WE'RE IN RECESS.

14            GOOD LUCK, AGENT MILLER.

15            THE WITNESS.  THANK YOU.

16                        --OOO--

17

18            I HEREBY CERTIFY THAT THE TESTIMONY

19            ADDUCED IN THE FOREGOING MATTER IS

20            A TRUE RECORD OF SAID PROCEEDINGS.

21

22        S/EVA OEMICK                5-15-08

23        EVA OEMICK                    DATE
          OFFICIAL COURT REPORTER
24

25